NO. 13-2153

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Michael Godbey, Plaintiff-Appellant

vs.

Iredell Memorial Hospital, Incorporated, Defendant-Appellee

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT STATESVILLE

_____

**RESPONSE BRIEF OF
IREDELL MEMORIAL HOSPITAL, INCORPORATED**

_____

Deborah Whittle Durban
Nelson Mullins Riley & Scarborough
1320 Main Street / 17th Floor
Columbia, SC  29201
(803) 799-2000

*Counsel for Appellee, Iredell Memorial
Hospital Incorporated*

Donald R. Pocock
Nelson Mullins Riley & Scarborough
380 Knollwood Street, Suite 530
Winston-Salem, NC  29393
(336) 774-3300

*Counsel for Appellee, Iredell Memorial
Hospital Incorporated*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __13-2153__    Caption: __Michael Godbey v. Iredell Memorial Hospital, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Iredell Memorial Hospital, Incorporated
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
    (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Deborah Whittle Durban          Date:    9/27/2013

Counsel for: Iredell Memorial Hospital, Inc.

## CERTIFICATE OF SERVICE
*****************************

I certify that on      9/27/2013      the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert M. Elliot at @rmelliot@epmlaw.com
Donald Pocock at
donald.pocock@nelsonmullins.com

s/ Deborah Whittle Durban                              9/27/2013
(signature)                                                        (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUE ON APPEAL ........................................ 1

STATEMENT OF THE CASE ............................................................... 1

STATEMENT OF FACTS ..................................................................... 3

SUMMARY OF ARGUMENT ............................................................ 17

STANDARD OF REVIEW .................................................................. 19

ARGUMENT ...................................................................................... 20

I.    THE DISTRICT COURT CORRECTLY FOUND THAT IREDELL
DID NOT INTENTIONALLY DISCRIMINATE AGAINST
GODBEY IN VIOLATION OF SECTION 504 OF THE
REHABILITATION ACT ................................................................ 20

    A.    Iredell provided Godbey reasonable accommodations for his
deafness. ............................................................................ 23

    B.    Iredell had no notice its communication with Godbey was not
effective. ............................................................................ 27

    C.    Iredell's official took appropriate action when informed
Godbey had requested a sign language interpreter. ............. 34

    D.    Iredell has policies and procedures to ensure that hearing-
impaired patients are provided effective communication. ..... 39

    E.    Godbey failed to demonstrate that Iredell intentionally
discriminated against him. .................................................. 42

CONCLUSION ................................................................................... 47

# TABLE OF AUTHORITIES

## CASES

*B.M. v. South Callaway R-II School District,*
732 F.3d 882 (8th Cir. 2013) ...................................................................22

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,*
132 F.3d 1017 (4th Cir. 1997) ................................................................20

*Board of Education v. Rowley,*
458 U.S. 176 (1982) ................................................................................23

*Bouchat v. Balt. Ravens Football Club, Inc.,*
346 F.3d 514 (4th Cir. 2003) ........................................................... 19, 20

*Bozeman v. Orum,*
422 F.3d 1265 (11th Cir. 2005) ..............................................................39

*City of Canton v. Harris,*
489 U.S. 378 (1988) ......................................................................... 22, 27

*Couch v. Jabe,*
679 F.3d 197, 200 (4th Cir. 2012) ..........................................................19

*Delano-Pyle v. Victoria County, Tex.,*
302 F.3d 567 (5th Cir. 2002) ..................................................................21

*Duvall v. County of Kitsap,*
260 F.3d 1124 (9th Cir. 2001) ....................................................... 21, 22, 27

*Feldman v. Pro Football, Inc.,* No. 09-1021,
2011 U.S. App. LEXIS 6188 * 28 (4th Cir. March 25, 2011) ...........................34

*Freydel v. New York Hospital,* No. 00-7108,
U.S. App. LEXIS 31862 at * 14 (2d Cir. Dec. 13, 2000) ........................... 36, 42

*Gebser v. Lago Vista Indep. School Dist.,*
524 U.S. 274, 290 (1998) (Title IX) ................................................... 34, 35

*Liese v. Indian River County Hosp.,*
701 F.3d 334 (11th Cir. 2012) ............................... 21, 35, 36, 37, 43, 44

*Loeffler v. Staten Island Univ. Hosp.,*
  582 F.3d 268 (2d Cir. 2008) ............................................................ 21, 27, 35, 44

*Meagley v. City of Little Rock,*
  639 F.3d 384 (8th Cir. 2011) ...............................................................21

*Nordwall v. PHC-Las Cruces, Inc.,*
  CA No.12-0429, 2013 U.S. Dist. LEXIS 116039, *161
  (D. N.M. July 31, 2013) ......................................................................41

*PBM Prods., LLC v. Mead Johnson & Co.,*
  639 F.3d 111 (4th Cir. 2011) ...............................................................19

*Posner v. Adventist Healthcare, Inc.,*
  C.A. No. JKS 08-3306, 2010 U.S. Dist. LEXIS 63114
  (D. Md. June 24, 2010)........................................................................21

*Powers v. MJB Acquisition Corp.,*
  184 F.3d 1147 (10th Cir. 1999)............................................................21

*Proctor v. Prince George's Hospital Center,*
  32 F. Supp. 2d 820 (D. Md. 1998) ........................................... 21, 23, 45

*Robertson v. Las Animas County Sheriff's Dept't,*
  500 F.3d 1185 (10th Cir. 2007)............................................................28

*Rosen v. Montgomery County,*
  121 F.3d 154, n.3 (4th Cir. 1997)........................................................35

*Saltzman v. Board of Commissions of the*
  *North Broward Hospital District,* No. 0612734,
  2007 U.S. App. LEXIS 14294 at **8 (11th Cir. June 15, 2007) ............ 36, 41, 42

*Sellers v. The School Board of Manassas, Virginia,*
  141 F.3d 524 (4th Cir. 1998) ...............................................................22

*Stone v. Liberty Mut. Ins. Co.,*
  105 F.3d 188 (4th Cir. 1997) ...............................................................20

**STATUTES**

28 U.S.C. § 1291 ..........................................................................................1

iii

28 U.S.C. § 1331 ................................................................................1

29 U.S.C. § 794 .................................................................................2

29 U.S.C. § 794(a) ..................................................................... *passim*

42 U.S.C. § 12101 ..............................................................................2

N.C. Gen. Stat. § 90D-4 ..................................................................25

**RULES**

Fed. R. Civ. P. 56 .............................................................................3

Fed. R. Civ. P. 56(a) ......................................................................19

Fed. R. Civ. P. 56(e) ......................................................................20

**REGULATIONS**

28 C.F.R. § 35.104 ..........................................................................23

28 C.F.R. § 36.303(c)(1)(ii) ..........................................................34

45 C.F.R. § 84.52(d)(3) ..................................................................23

## STATEMENT OF JURISDICTION

Michael Godbey ("Godbey"), who is deaf, alleges that Iredell Memorial Hospital ("Iredell" or "Hospital") violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Rehabilitation Act" or "Section 504") by not providing him effective communication when he was a patient. The United States District Court for the Western District of North Carolina had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

On August 19, 2013, the District Court issued a final order granting Iredell's Motion for Summary Judgment. Godbey filed a timely appeal on September 18, 2013. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE ON APPEAL

Did the District Court correctly hold that Iredell did not intentionally discriminate against Godbey in violation of Section 504 of the Rehabilitation Act during his visits to the Hospital in 2010 and 2011?

## STATEMENT OF THE CASE

Godbey, a deaf thirty-six year old man, was a patient at Iredell on six occasions in 2010 and 2011. During these visits, Iredell offered Godbey various auxiliary aids including written notes, preprinted written material, picture boards, telecommunication devices for the deaf ("TDD"), and sign language interpreters. On the two occasions in which Godbey requested sign language interpreters,

1

interpreters were provided. At no time during these visits did Godbey notify Iredell that the auxiliary aids, including the interpreters, did not provide him effective communication, and as a result, Godbey's caregivers believed that they effectively communicated with Godbey using these auxiliary aids.

On January 20, 2012, Godbey filed suit alleging that Iredell violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, by not providing him effective communication. His Complaint sought both injunctive and monetary relief.

Following discovery, Iredell moved for summary judgment on both of Godbey's claims. The District Court granted Iredell's Motion for Summary Judgment, holding that Iredell did not intentionally discriminate against Godbey in violation of § 504. The court further held that Godbey was not entitled to injunctive relief under the ADA because the basis for an injunction was rendered moot when Iredell amended its policy related to providing interpretation services.

Godbey appealed the District Court's grant of summary judgment on his claim for monetary damages under § 504 of the Rehabilitation Act. There is no continuing claim for injunctive relief under the ADA.

## STATEMENT OF FACTS

Godbey, a thirty-six year old man, has been deaf since birth.[1] JA 365. He attended several schools for the deaf before completing a certificate from the North Carolina School for the Deaf in 1995. JA 366. He also attended community colleges in Hickory and Morganton, North Carolina. JA 366. Godbey was most recently employed at Logan's Restaurant where he communicated by using what he calls "home signs." JA 364. After working for Logan's for approximately three years, he was fired for being too aggressive with his sign language. JA 364. He is currently unemployed. JA 363.

Iredell, located in Statesville, North Carolina, is a local, not-for-profit hospital with approximately 240 beds. JA 39. Established in 1954 as a community hospital, the grounds and buildings of Iredell continue to be owned by the citizens of Iredell County and all revenue earned by the Hospital is reinvested in medical technology and staff in order to promote the health and wellness of the citizens of Iredell County. JA 39.  Iredell is governed by a Board of Trustees made up of approximately 106 citizens of Iredell County. JA 39. The Board of Trustees selects

---

[1] Many of the facts cited in Appellant's Brief contain cites from Godbey's Expert Report, JA 245-249, his Supplemental Expert Report, JA 268-271, and his Complaint, JA 9-22. To the extent these documents contain unsworn testimony, that testimony is inadmissible under Rule 56 of the Federal Rules of Civil Procedure.

3

the members of the Board of Directors, who, in turn, oversee the day-to-day operations of the Hospital. JA 39.

### Iredell's Policies and Practices Regarding Services to Deaf and Hearing Impaired Patients

Iredell is committed to providing effective communication to all of its patients. JA 40. With that goal in mind, Iredell has adopted policies and procedures to provide guidance to its staff in communicating with deaf or hearing/speech impaired patients. JA 40.  All patients admitted to Iredell are informed of their right to effective communication through the Patient's Bill of Rights, which is included in the Patient Handbook. JA 40, 45.

Iredell's policy entitled "Communicating with Patients Who Are: Hearing Impaired, Speech Impaired, Limited English Proficient Individual," was in effect when Godbey was a patient at the Hospital.  JA 40. According to this policy, Iredell relies on a variety of approved auxiliary aids to provided effective communication, including written and preprinted materials, adjustable volume telephone handsets, "pocket-talkers," closed-captioned TV sets, telecommunication devices for the deaf (TDD's), telecommunication relay services, picture boards, and sign language interpreters, all at no charge to the patient. JA 47-51.

Pursuant to the policy, any Hospital staff member who believes that an interpreter is needed to communicate effectively with a patient is instructed to contact the Administrative Nursing Supervisor or the Administrator-on-Call, who

4

will then contact an interpreter using a list of certified sign language interpreters which is kept in the Administrative Nursing Supervisor's office. JA 47-51.

In April 2012, Iredell contracted with Deaf Talk to provide video-interpreting services (VRI), in addition to the other auxiliary aids. JA 41. Deaf Talk permits Iredell to respond more quickly to those patients who need interpreting services by utilizing sign language interpreters wirelessly over the internet. JA 41. Iredell continues to use both VRI and live interpreters, as well as other approved auxiliary aids, to communicate with hearing-impaired patients, and has updated its policy to include the VRI services. JA 53-55.

Iredell's employees are trained on the need for and the use of these auxiliary aids by both classroom and computer-based training which they are required to take on a periodic basis. JA 57-70. A report is generated each year that is sent to the Vice President of Nursing and the Education Department noting which employees have been trained, and employees who do not participate in the training are subject to discipline including suspension. (Sharpe Dep. pp. 89-91, CA: 5:12-cv-00004, Dkt. No. 29-12, pp. 24-25 of 27.)

Iredell is a small, community hospital and does not have many hearing-impaired patients, however hospital records indicate that from 2010 through 2012, Iredell provided and paid for outside sign language interpreters twenty-six times for six different patients who had either requested interpreters or for whom the

Hospital staff believed interpreting services were necessary. JA 41-42. At the time of Godbey's visits to Iredell, to the Hospital's knowledge, there were no certified sign language interpreters located in Statesville. JA 41. When necessary, Iredell brought in interpreters from out of town. JA 41. Because these interpreters often required significant travel time, it was not always possible to have live interpreters available on short notice. JA 144.  Iredell's decision to offer VRI services, as well as live interpreters, was to help provide more timely interpreting for hearing-impaired patients when live interpreters are not available because at all times Iredell's objective is to provide the best services possible.

### Iredell's Patient Advocate and Grievance Procedure

Iredell has a grievance policy and procedure for patients who may have concerns regarding their care, treatment, or services received at the hospital. JA 42, 72-75. Patients and family members are informed of the grievance procedure through the Patient Handbook and are instructed to report any concerns about their treatment or services to the Patient Advocate during business hours, or the Administrative Nursing Supervisor after business hours. JA 42, 72-75.  Although Godbey claims that Iredell failed to provide him effective communication, he did not avail himself of the grievance policy during or after any of his visits. JA 42.

## Godbey's Visits to Iredell

Godbey was a patient at Iredell a total of six times in 2010 and 2011. Godbey also visited his surgeon, Dr. Dunaway, at Dunaway's office in 2010. These visits are described below.

### March 19, 2010

Godbey's first visit to Iredell was on March 19, 2010, when he was brought to the emergency room at Iredell while in police custody, after complaining about pain in his knee and shoulder. JA 372-373. He had been arrested that same night for trespassing and damaging personal property. JA 372-373. Godbey testified that before arriving at the emergency room, he made two requests to the police to provide him a sign language interpreter. JA 456. Godbey did not request an interpreter from anyone employed by Iredell and he has no idea whether the police ever forwarded his request to Iredell. JA 381-382.

Although Godbey now claims that he was entirely unable to communicate with hospital personnel during this visit, he admitted that he never informed Iredell of this fact, either during the visit or afterwards. JA 42, 387. Godbey's March 19 medical records indicate that upon arrival, his history was obtained "via signing with the assistance of one of the nursing staff." (England Dep. p. 19, CA: 5:12-cv-00004, Dkt. No. 29-4, p. 7 of 14.) The emergency department's triage nurse, Sherry England ("England"), testified that she took Godbey's medical history by

signing with him and, according to his medical records, another employee also signing with him. JA 91, 493. Godbey does not recall either of these individuals signing with him and testified that his mother, Summer Mickelson ("Mickelson") did most of the interpreting for him with the doctor; however, Mickelson testified that she was not at the hospital during this visit. JA 102, 382, 384.

England received training in sign language by taking two sign language courses at a local college. JA 95-96. England also interprets for a deaf family member, including when the family member was a patient in the hospital. JA 95. England testified that she communicated with Godbey using sign language. Although she offered to get him another interpreter if he could not understand her, he denied needing another one and acknowledged that he understood her communication with him through sign language. JA 92, 98. When asked if there were any communication barriers with Godbey, England responded there were none during the time she was attending to him. JA 98. In England's opinion, Godbey received effective communication because he communicated to her that he understood everything she asked and he answered her questions appropriately. JA 93. Godbey also acknowledged to her that he understood all of the written information he was provided. JA 94.

Godbey testified that he wrote notes back and forth with the staff during his March 19 visit, but he admitted that he never wrote that he could not understand

England's sign language interpretation. JA 387. He also signed discharge paperwork stating that "I have received this information and my questions have been answered. I have discussed any challenges I see with this plan with the nurse or physician." JA 482-484. Although Godbey now claims that he did not pay any attention to this form because he does not read English well, he admitted he never told anyone at Iredell that he could not read English and also admitted he could understand the words quoted above. JA 389, 393-394.

<u>August 17, 2010</u>

Godbey claims his next visit to Iredell occurred on August 17, 2010, when he had an appointment with Dr. Dunaway at his office to discuss diagnosis and treatment for a broken collarbone and torn knee ligaments. JA 396. Dunaway is a private orthopedic surgeon who practices with Piedmont Health Care in Statesville, North Carolina. JA 341. Although Dunaway has surgical privileges at Iredell, he is not an employee, official, or policymaker for the Hospital, and his office is not located within the Hospital. JA 341.

Godbey claims that he requested an interpreter at the receptionist desk at Dunaway's office by writing and signing. JA 411-412. Although no interpreter was provided, Godbey did not repeat his request to Dunaway and Godbey never informed Dunaway that he could not understand. JA 398, 412.

9

<u>August 23, 2010</u>

On August 23, 2010, Godbey came to Iredell for surgery on his shoulder. JA 400. When asked if he had requested an interpreter when he checked-in at pre-op, Godbey replied "No. They knew I was deaf." JA 400-401. One of Godbey's nurses, Tami Wooten, checked a box on the Nursing Care Record entitled "Ineffective Communication" and noted on the line next to the box that Godbey was deaf. JA 502. Wooten also noted on the same box that Godbey's cognitive abilities were within normal limits. JA 502. Wooten explained that she checked the box merely to note that Godbey is deaf and does not communicate as hearing people communicate. JA 344. Wooten further explained that if she had thought in her professional judgment that Godbey was not receiving effective communication, she would have immediately contacted the nurse manager and arranged for appropriate aids and services, including sign language interpreters. JA 345.

Godbey does not recall whether he ever expressed to anyone at Iredell during this visit that he was not able to communicate effectively. JA 401. When he got home from the hospital, he never expressed any dissatisfaction to Iredell regarding its communication with him and he opted to return to the hospital several weeks later for knee surgery. JA 42, 401-403.

<u>September 29, 2010</u>

Approximately five weeks after his shoulder surgery, Godbey returned to Iredell to have outpatient surgery on a torn ligament in his knee. JA 403. Godbey admitted that he did not ask anybody for an interpreter on this visit and has no knowledge whether anyone else requested an interpreter for him. JA 415-416. He never notified anyone at Iredell after this visit of his dissatisfaction with their communication with him. JA 42. Godbey now claims the Hospital should have provided him an interpreter because they knew he was deaf. JA 404.

<u>October 9-11, 2010</u>

Godbey came to the emergency room at Iredell on October 9, 2010 because he was having pain in the same knee that was previously operated on. JA 417. Godbey was told that he had a wound infection and was given a shot and a prescription for medicine. JA 486.

The next day, Sunday, October 10, Godbey, believing his infection was getting worse, asked his mother to call ahead and let Iredell know that he was coming to the emergency room and needed an interpreter. JA 419-420. Mickelson called the emergency room and spoke to the receptionist, telling her that she was bringing her son, who is deaf, to the emergency room and he needed an ASL

11

interpreter.[2] JA 106. Godbey and his parents arrived at the emergency room about 8:00 p.m., and when there was no interpreter present, Godbey requested Mickelson ask again. JA 107-108.  Mickelson then called the Hospital on her cell phone and asked to speak to whoever was in charge.  JA 110.  Mickelson was put through to the nurse manager, Susan Walker ("Walker"), who informed her that she was working on having an interpreter brought to the emergency room. JA 110.  Godbey and his parents waited about forty minutes, at which time a nurse called Godbey into triage. JA 112-113.

Because an interpreter still had not appeared, Godbey reiterated his request for an interpreter through his mother who told the triage nurse that "Godbey was insisting on an interpreter." JA 114. The nurse told Mickelson she would call the nurse manager again. JA 81. The nurse then began obtaining information from Godbey by writing back and forth and Godbey was very cooperative. JA 81. Mickelson, however, became loud and angry because the interpreter had not yet arrived, and the nurse subsequently requested Mickelson leave the room so that she could continue getting Godbey's history. JA 80, 81. When Mickelson refused to leave and continued to be loud, the nurse called security. JA 80, 81. The security

---

[2] Godbey states that when Mickelson first called, she spoke to Susan Walker, the highest-ranking employee on duty at the time. (Appellant's Brief at p. 13.) This is contradicted by Mickelson's testimony that when she called the first time, she spoke to the receptionist in the emergency room. JA 105-106. Mickelson did not speak to Walker until after she arrived at the emergency room around 8:00 p.m. JA 110.

officer told Mickelson that she would have to leave the Hospital because she was upsetting the other patients and when she refused, the officer informed her that he would arrest her if she did not. JA 116-117. Mickelson and her husband left but once in the parking lot, she got into a heated argument with the security officer and asked him "who in the fuck he was talking to." JA 119. The security officer then arrested Mickelson and she was subsequently charged with disorderly conduct, assaulting a police officer, and resisting arrest.[3] JA 121.

In the meantime, Walker had been trying to locate an interpreter for Godbey. JA 148-149. Because she was unable to locate the list of interpreters normally kept in the nursing manager's office, she called the nursing manager who had preceded her on the day shift, Tresa Shaw, to see if she knew where the list was. JA 150-151. Tresa Shaw told Walker that she did not but that her sister-in-law, Angie Shaw ("Shaw"), also a nurse at Iredell, could interpret for Godbey because she had a disabled thirteen-year old daughter who was deaf and Shaw had learned sign language in order to communicate with her daughter. JA 151-152. Shaw had received sign language training when her daughter was young by having a sign language teacher from the Morganton School for the Deaf come to her house every

---

[3] At trial, Mickelson was found guilty of disorderly conduct and resisting arrest but the charge of assaulting a police officer was dismissed. JA 121-122. Mickelson appealed the conviction and upon appeal, she entered a plea of no contest and was fined and placed on probation. JA 122-123.

week for a year to instruct her in sign language in order that she could communicate with her daughter. JA 186-187.

Walker subsequently contacted Shaw, who was not on duty, and asked her to come to the emergency room to interpret for Godbey and then informed Godbey's step-father that an interpreter was on the way. JA 155. Walker then went to Godbey's room and wrote him a note telling him who she was, asking him about his symptoms, and informing him that an interpreter would be there in about twenty minutes.[4] JA 159-161, 495. When she asked him by writing if he was in pain, Godbey wrote back "I was in pain I took pain killer oxdocodone an hr before I got here. I was here due pain from wound inflection I got shot and note for med but getting worse I feel it grown numb now Inflection must be spreading." JA 495. Walker believed that she was able to effectively communicate with Godbey through written notes. JA 161. While waiting for the interpreter to arrived, Godbey continued to communicate with medical staff by writing notes. JA 496-498.

Shaw arrived at the emergency department about 9:00 and interpreted with Godbey for about forty-five minutes until he was admitted to the hospital.[5] JA 182.

---

[4] Godbey claims that Walker knew her representation that an interpreter was coming was untrue. (Appellant's Brief at p. 16.) This is not true. Walker knew that Shaw, whom she believed to be qualified to interpret for Godbey, was on the way to the Hospital. JA 159-161.

[5] Shaw was accompanied by her sister, Laura Harris ("Harris"), who is also a nurse at Iredell, but Harris did not interpret for Godbey. JA 339.

Shaw testified that although there were a couple of times that she had difficulty understanding what Godbey was signing to her and had to ask him to write some things down, overall she believed her communication with him was effective. JA 182-183. Godbey never asked for any one else to come and interpret. JA 188. Before leaving, Shaw checked with Godbey and made sure he was satisfied and that it was okay for her to leave. JA 182-183. Godbey claims that he alerted Shaw that he could not understand her by writing on a note "[y]ou may need 4 eyes to catch up w/ fast sign lang." JA 432, 490.

Although Godbey now claims that Shaw had to use fingerspelling to communicate with him, he admitted that he never told anyone he needed a different type of interpreter or that Shaw's communication with him was not effective. JA 433-434. Godbey, who was also writing notes back and forth with the medical staff, never wrote that he needed an interpreter, or that he needed a different type of interpreter, or that he did not understand her. JA 437, 495-498.

Godbey now claims that Shaw lacked the most basic ability to communicate in sign language, and relies on his expert's report to demonstrate this. (Appellant's Brief at p. 18.) Godbey's expert, who rated Shaw as "novice to beginning," based his opinion regarding the effectiveness of both England's and Shaw's interpreting skills on what Godbey reported to him and the expert's review of limited video excerpts from England's and Shaw's depositions. JA 268-271, 313, 323. Notably

15

these depositions occurred more than two years after England and Shaw had interpreted for Godbey, and during the depositions, they were asked to interpret documents and phrases they had not necessarily used with Godbey. JA 202. The video excerpts that the expert analyzed were between five to ten minutes in length and he did not know whether the excerpts had been edited. JA 313-314. Most importantly, the expert admitted that in his practice, he would not rate an individual's sign language ability based on a five to ten minute video clip. JA 313-314.

When Godbey was subsequently admitted to his hospital room, his nurse, Heather White ("White"), noted on his medical chart that Godbey was deaf but reads and writes English to communicate. JA 500. White communicated with him through written notes, pictures, and offered him the use of a TDD, which he refused, stating he wanted to continue to write notes. JA 227-228, 500. The TDD was left in Godbey's room in case he wanted to use it later. JA 227-228, 500. White noted on Godbey's Education Assessment that he was a level II, noting that he was deaf but also exhibited a high ability to grasp concepts and respond to questions. JA 291. Godbey never requested an interpreter for the remainder of his stay at Iredell or complained to anyone that he could not understand what was happening. JA 439.

16

<u>January 17, 2011</u>

On January 17, 2011, Godbey again came to Iredell's emergency room. JA 444.  When he arrived, Godbey claims he requested an interpreter by both signing and by writing a note. JA 444-445. Iredell provided an interpreter for him, but the identity and training of this interpreter is not noted in Godbey's medical records from this visit. JA 445-446. Godbey did not remember whom Iredell sent but claimed he knew the interpreter was not certified because "they were slowly fingerspelling every letter of the word, and they had no idea to show that they were a certified interpreter." JA 446. Although Godbey now claims he could not understand this interpreter, he did not tell the interpreter he could not understand, he did not tell any hospital staff the he could not understand the interpreter, and he did not tell the doctor he could not understand. JA 446-447. Rather, Godbey claims the doctor should have been able to see by the expressions on his face that he could not understand. JA 447-448.

## **SUMMARY OF ARGUMENT**

Section 504 of the Rehabilitation Act requires that hospitals who are recipients of federal funding provide appropriate auxiliary aids to persons with impaired sensory and speaking skills, where necessary to afford such persons an equal opportunity to benefit from the hospital's services.  Under the deliberate indifference standard used by some courts in § 504 failure to accommodate cases,

Godbey has the burden of demonstrating that Iredell had notice that his rights were likely to be violated and failed to act upon that likelihood.

During Godbey's visits to Iredell, the Hospital reasonably accommodated Godbey's deafness by providing him with a variety of approved auxiliary aids. These aids included written notes, preprinted materials, telecommunication devices for the deaf ("TDD's), picture boards, and sign language interpreters. On the two occasions Godbey requested sign language interpreters, interpreters were provided.

Godbey never informed Iredell that these auxiliary aids did not provide him with effective communication. Furthermore, the Iredell caregivers who treated Godbey each believed that they could effectively communicate with him using these auxiliary aids. Although Godbey now claims that Iredell violated § 504 by not providing him ASL certified interpreters, there is no per se rule that interpreters are required in hospital settings if other aids provide effective communication.

It is Godbey's burden to show that Iredell had notice that his rights were likely to be violated and failed to take corrective action. Because Iredell had no notice from either Godbey or his caregivers that he was not able to effectively communicate, Godbey has failed to show that Iredell was deliberately indifferent to his rights.

Furthermore, the only Iredell official who had notice of Godbey's request for an interpreter responded immediately to the request and had an interpreter

18

brought to the hospital for him. Iredell also has policies and procedures in place to ensure that hearing impaired patients are afforded the aids necessary to ensure effective accommodation.

Based on these facts, the district court correctly granted summary judgment to Iredell finding that there was no genuine issue of material fact that Iredell had not intentionally discriminated against Godbey because it provided him reasonable accommodations and had no notice that these accommodations were not effective.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, applying the same standard as the trial court. *Couch v. Jabe,* 679 F.3d 197, 200 (4th Cir. 2012). In conducting such a review, the Court construes the evidence, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the nonmoving party. *PBM Prods., LLC v. Mead Johnson & Co.,* 639 F.3d 111, 116 (4th Cir. 2011). Summary judgment is appropriate only when "there are no genuine disputes as to any material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a).

Once the movant has satisfied the initial burden of demonstrating the absence of a genuine dispute as to any material fact, the nonmoving party must show that a genuine dispute does, in fact, exist. *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003). A party raises a genuine issue of

material fact with respect to a claim only if a reasonable jury could return a verdict for that party on each element necessary to that claim. *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1027 (4th Cir. 1997).

Although the Court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. *Stone v. Liberty Mut. Ins. Co.,* 105 F.3d 188, 191 (4th Cir. 1997). Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat,* 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e)). If the adverse party fails to produce evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered. *Id.*

## **ARGUMENT**

## I.   THE DISTRICT COURT CORRECTLY FOUND THAT IREDELL DID NOT INTENTIONALLY DISCRIMINATE AGAINST GODBEY IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT.

The District Court held that "where reasonable accommodations were made and in the absence of information indicating that such accommodations would fall short in ensuring effective communication, there is **no** intentional discrimination." (Order at 14.) (emphasis added.)  Viewing the facts in the light most favorable to Godbey, the District Court correctly granted summary judgment to Iredell, finding

that there was no issue of material fact that Iredell had not intentionally discriminated against Godbey in violation of § 504.

In making this finding, the District Court used the "deliberate indifference" standard that has been adopted by several appellate circuits in failure to accommodate lawsuits brought under § 504. *See, e.g., Liese v. Indian River County Hosp.,* 701 F.3d 334, 345 (11th Cir. 2012); *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 275 (2d Cir. 2008); *Duvall v. County of Kitsap,* 260 F.3d 1124, 1138 (9th Cir. 2001); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147, 1153 (10th Cir. 1999); *Meagley v. City of Little Rock,* 639 F.3d 384, 389 (8th Cir. 2011). *But see Delano-Pyle v. Victoria County, Tex.,* 302 F.3d 567, 575 (5th Cir. 2002) (rejecting the deliberate indifference standard as regards public entities). At least one district court in the Fourth Circuit has adopted the deliberate indifference standard in failure to accommodate cases brought against hospitals. *See, e.g., Posner v. Adventist Healthcare, Inc.,* C.A. No. JKS 08-3306, 2010 U.S. Dist. LEXIS 63114 (D. Md. June 24, 2010); *Proctor v. Prince George's Hospital Center,* 32 F. Supp. 2d 820, 829 (D. Md. 1998).

The Fourth Circuit has not yet determined the appropriate standard to use to demonstrate discriminatory intent regarding claims against hospitals for failing to accommodate the disabilities of patients under § 504. But the Court has held in an educational context that the standard for finding intentional discrimination and

awarding compensatory damages under § 504 is "bad faith or gross misjudgment." *Sellers v. The School Board of Manassas, Virginia,* 141 F.3d 524, 529 (4th Cir. 1998). The "bad faith or gross misjudgment" standard requires that the "defendant's statutory non-compliance deviated so substantially from accepted professional judgment, practice, or standards so as to demonstrate the defendant acted with wrongful intent." *B.M. v. South Callaway R-II School District,* 732 F.3d 882, 887 (8th Cir. 2013) (internal quotations omitted).

Regardless of which standard the Court uses—"deliberate indifference" or "bad faith or gross misjudgment"—Godbey has failed to put forth facts showing intentional discrimination. Under the more lenient deliberate indifference standard which was used by the District Court, Godbey has the burden of demonstrating that Iredell had notice that a federally protected right was likely to be harmed and failed to act upon that likelihood. *See City of Canton v. Harris,* 489 U.S. 378, 395 (1988) (O'Connor, J., concurring) (Deliberate indifference requires both "some form of notice . . . and the opportunity to conform to statutory dictates."). Furthermore, negligence cannot constitute deliberate indifference. *See Duvall,* 260 F.3d at 1140 ("failure to act must be a result of conduct that is more than negligent and involves an element of deliberateness").

As Iredell will show below, there is no genuine issue of material fact that it did not intentionally discriminate against Godbey by being deliberately indifferent

22

to his rights under § 504 because it provided reasonable accommodations for his deafness, and although Godbey claims now these accommodations were not effective, Iredell had no notice of this until Godbey filed this lawsuit.

## A. Iredell provided Godbey reasonable accommodations for his deafness.

Although the District Court found there was a genuine issue of fact as to whether Iredell always communicated effectively with Godbey, it held that any failure by Iredell was not intentional and thus did not substantiate a claim for monetary damages under § 504. (Order at pp. 12-13.)

The undisputed facts show that Iredell provided Godbey with various auxiliary aids, including writing notes, pre-printed materials, picture boards, TDD's, and sign language interpreters, all of which are approved auxiliary aids as provided under the relevant regulations implementing the ADA and § 504. 28 C.F.R. § 35.104; 45 C.F.R. § 84.52(d)(3). Although Godbey would wish otherwise, there is no per se rule that sign language interpreters are necessary in hospital settings for deaf patients. *See Proctor,* 32 F. Supp. 2d at 827 ("Neither the precedents nor the regulations, however, establish a per se rule that sign language interpreters are necessary in hospital settings."). *See also Board of Education v. Rowley,* 458 U.S. 176 (1982) (holding sign language interpreters are not required when lip reading, or by extension other accommodations, are sufficient). Without notice from Godbey that the auxiliary aids provided to him were not effective,

23

Iredell did not (and could not) intentionally discriminate against him by providing auxiliary aids other than ASL certified interpreters.

Iredell did provide sign language interpreters for Godbey on at least three different hospital visits—March 19, 2010; October 10, 2010; and January 17, 2011, including the only two times he made specific requests for interpreters.[6] JA 182, 445-447, 493. On his other visits, Godbey admits he did not request an interpreter and he communicated with staff by writing notes. JA 400-401, 414, 415-416. Godbey now claims that these interpreters were unqualified, and that he could not read and write English well, but at the time of his visits, he never alerted anyone at Iredell of either. JA 42, 97, 433-434, 439, 446-447, (Godbey Dep. p. 154, 5:12-cv-0004, Dkt. No. 30-1 at p. 41 of 52.)

Godbey relies on an expert who determined two years after his visits that two of the interpreters, England and Shaw, were unqualified. Even if the expert's opinion is to be considered and given any weight, that opinion does not mean that

---

[6] Godbey claims that he requested an interpreter on his September 29 visit by pointing to his ears and shaking his head. (Appellant's Brief at p. 39.) This may have provided notice to Iredell that he was deaf but it did not provide notice he needed an ASL certified sign language interpreter. Godbey further claims that he made repeated requests for ASL certified interpreters (Appellant's Brief a p. 37.) The record, however, reflects only one time when an ASL interpreter was specifically requested and that was by Mickelson during Godbey's October 10 visit. Although Walker attempted to locate the lists of certified interpreter she was unable to do and subsequently called Shaw to come interpret, believing her to be qualified to do so.

Iredell knew at the time that either interpreter was ineffective because Godbey never informed the Hospital.  Furthermore, regardless of Godbey's argument to this Court, there is no requirement that interpreters must be certified.[7]  Despite Godbey's claims to the contrary, both England and Shaw had training and experience with sign language, including ASL, such that it was reasonable for Iredell to rely on them to provide effective communication.[8] JA 96-96. 186-187. Thus, without any notice from Godbey that Shaw and England were not competent to communicate with him, it was reasonable for Iredell to rely on both of them to provide effective communication to him.

In addition to sign language interpreters, Iredell communicated with Godbey through written notes, picture boards, and preprinted materials, all approved auxiliary aids under the regulations. It also offered Godbey the use of a TDD device, which he refused, noting that he would rather communicate by writing

---

[7] Godbey argues that Chapter 90D of the North Carolina General Statutes makes it illegal for a person who is not a licensed interpreter to offer herself as an interpreter. (Appellant's Brief at p. 6, n. 1.)  Godbey has omitted an important part of this statute which provides that it is illegal only if a person practices as an interpreter **for a fee** or represents themselves as licensed unless licensed. N.C. Gen. Stat. § 90D-4. None of the individuals who interpreted for Godbey held themselves out to be licensed interpreters or received any fee for interpreting.

[8] As to the other two interpreters, Godbey does not recall the second individual who interpreted for him during the March 19, 2010 visit, but claims after the fact that the unnamed individual who interpreted for him during the January 17, 2011 visit, whom he mistakenly identifies as England, was not certified and had to slowly fingerspell words. JA 384, 445-446.

notes. JA 227-228, 500. Godbey claims now that written communication was not effective because he cannot read or write English very well, yet he admits that he never informed any staff at Iredell of this fact. JA 389, (Godbey Dep. p. 154, 5:12-cv-00004, Dkt. No. 30-1 at p. 41 of 52.) Thus it was also reasonable for Iredell to rely on written notes and preprinted materials to communicate with Godbey and use of these means of communication is not evidence that Iredell intentionally discriminated against Godbey.

Iredell took significant efforts to provide Godbey appropriate auxiliary aids to ensure his communication was effective. Had Iredell known that Godbey did not believe he was receiving effective communication, it would have provided him other auxiliary aids, including different interpreters. It is easy for Godbey to claim now, two years after the fact, that Iredell violated § 504 because these aids did not provide effective communication for him, but he had the responsibility and the capability at the time of his visits to alert Iredell in order that Iredell could take corrective action at the time to ensure he was receiving effective communication, and he failed to do so. Critically, through all of these interactions, Godbey never alleges that any of the medical treatment he received was improper or deficient in any way, which is perhaps the best evidence that communication was effective. Even if Iredell may have been negligent in its efforts to provide effective

communication to Godbey, negligence alone does not mean that Iredell was deliberately indifferent to Godbey's rights. *See Duvall,* 260 F.3d at 1129.

**B.    Iredell had no notice its communication with Godbey was not effective.**

Deliberate indifference requires that an organization have notice that a federal protected right is likely to be harmed. *See City of Canton v. Harris,* 489 U.S. at 395; *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 276-77 (2d Cir. 2009) (finding deliberate indifference when a hospital had actual knowledge of the discrimination and the authority to correct it, and failed to do so).

As the District Court noted, Godbey "made remarkably little effort to put hospital staff on notice of their alleged communicative deficiencies during the visits here at issue." (Order at p. 13.)  In fact, Godbey's own sworn testimony demonstrates that he did not express to anyone at Iredell during any of his visits that he could not effectively communicate, either with the interpreters who were provided, or through written notes and materials.

Godbey argues that it was not necessary for him to alert Iredell that he needed ASL interpreters because his need was so obvious that Iredell should have known. (Appellant's Brief at 43-44.)  Iredell knew Godbey needed accommodation for his deafness which it provided.  It was not obvious to Iredell, however, that

Godbey could only communicate effectively by using ASL interpreters.[9] The facts of the case relied on by Godbey to show that obviousness equates to knowledge, *Robertson v. Las Animas County Sheriff's Dept't,* 500 F.3d 1185, 1197 (10th Cir. 2007), are different from the facts in this case.  There, the deaf prisoner needed to make a telephone call and the **only** auxiliary aid that would permit him to do so was a TTY device. Thus the prisoner's need for that specific device was obvious because no other accommodation would work. Here, as the District Court noted, and Godbey admitted, hospitals need not provide sign language interpreters for all deaf patients, noting that some patients have a strong command of English and do not need interpreters, or may need different types of interpreters, ASL not being universal. (Order at p. 13; Appellant's Brief at 27.)

Not only did Godbey not notify Iredell that he could not communicate effectively, his care providers believed in each instance they were able to communicate effectively with him. For example, during his first visit on March 19, 2010, Godbey wrote notes back and forth with the staff but testified he never wrote he could not understand or asked the staff for different accommodations.  JA 387. England who interpreted for Godbey during this visit believed he understood her

---

[9]Godbey does not use ASL exclusively. According to his expert, Godbey uses a variety of sign languages. Godbey's education included a mixture of ASL, Manually Coded English, and Pidgeon Signed English. Godbey communicates with family members using a combination of fingerspelling and signs from a limited vocabulary. When Godbey was communicating with the expert, he used a mixture of Pidgeon Signed English and ASL. JA 247.

because he communicated to her that he understood everything she asked and he answered her questions appropriately. JA 92. Godbey also acknowledged to her that he understood the written information he was provided, and he signed discharge paper work stating that "I have received this information and my questions have been answered. I have discussed any challenges I see with this with the nurse or physician." JA 93-94, 482-484.

During his next two visits on August 23 and September 29, 2010, Godbey did not request an interpreter either time even though these visits were scheduled in advance, stating when asked why he had not, "[t]hey knew I was deaf." JA 400-401, 404, 405, 414, 415. Godbey does not remember whether he ever told anyone at Iredell during these two visits that he could not understand. JA 400-401, 405, 414.

Godbey did have his mother call and request an interpreter before he came to the emergency room on October 10, 2010. JA 419-420. Upon receipt of this request, Susan Walker, the nurse manager on duty, after trying in vain to locate the list of outside interpreters kept by Iredell, contacted an off duty nurse, Angie Shaw, to come and interpret for Godbey. JA 150-152. Walker had been told that Shaw could interpret because she had learned sign language in order to communicate

with her deaf child.[10] JA 150-152. In the interim before Shaw arrived, Godbey communicated with nursing staff by writing notes. JA 485-490, 495-498. When Shaw arrived, she interpreted for Godbey for approximately forty-five minutes, including during the physical examination by his physician. JA 180. Although Godbey now claims that he could not understand Shaw, he never told Shaw or anyone at Iredell, by writing notes or otherwise, that he needed a different interpreter or that Shaw's communication with him was not effective.[11] JA 433-434. Shaw testified that although there were a couple of times she had difficulty understanding Godbey's signs to her and had to ask him to write it down, overall, she believed her communication with him was effective and he never asked for any one else to come and interpret. JA 182-183.

Heather White, Godbey's floor nurse when he was admitted on October 10 noted on his medical chart that Godbey was deaf but reads and writes English to communicate. JA 500. She also noted that Godbey was offered an interpreting machine to use in his room but refused it saying he would rather communicate by

---

[10] Shaw uses a regional form of ASL to communicate with her daughter although in the past she has also used Signed Exact English. JA 190.

[11] Godbey did write on a note, allegedly to Shaw, that "[y]ou may need 4 eyes to catch up w/ fast sign lang." and claims that this note was sufficient to place Iredell on notice that signing with Shaw was not effective. JA 490. Just because Shaw's signing may have been slow, does not convey that it was ineffective or that a different interpreter was needed. If Godbey could not understand Shaw, he could just have easily written "I can't understand you."

writing. JA 227-225, 500. White noted on Godbey's Education Assessment that he was a Level II, noting that he was deaf but also exhibited a high ability to grasp concepts and respond to questions. JA 219. Godbey never requested an interpreter for the remainder of his stay at Iredell or complained to anyone he could not understand what was happening. JA 439.

During his last visit to Iredell on January 17, 2011, Godbey requested an interpreter by both signing and by writing a note, and Iredell provided an interpreter for him.[12] JA 444-446. Godbey now claims that this interpreter was not certified and had to slowly fingerspell, but at no time during the visit did Godbey tell the interpreter, other Hospital staff, or his treating doctor that he could not understand or ask for any other type of auxiliary aid. JA 446-447.

Godbey argues that he could not ask for an interpreter because Iredell required him to provide oral notice of his need for an interpreter, which of course he could not do, arguing that Walker and another unnamed nurse would only call an interpreter "if Godbey himself *orally* made the request . . . ." (Appellant's Brief at 19) (emphasis in original.) This is untrue and is not supported anywhere in the record. Godbey further argues that the District Court's opinion required that

---

[12] The identity and training of this interpreter is not stated in Godbey's medical records. Godbey identifies this interpreter in his brief as England (Appellant's Brief at p. 21); however England was not present during the January 17, 2011 visit. According to Godbey's medical records and England's testimony, she was the interpreter during Godbey's March 19, 2010. JA 92, 493.

Godbey give oral notice that he did not understand. (Appellant's Brief at 38.) Again, this is not correct. The District Court correctly held that Iredell was not required to "guess" what accommodation plaintiff needed, noting that some deaf patients can participate in their treatment through the use of written notes or may use one of many different sign languages, ASL not being universal. (Order at p. 13.) There were numerous ways Godbey could have alerted Iredell that he did not understand without having to orally speak, one being by written notes which the record shows he was capable of doing. JA 485-490, 495-498.

Godbey points to two medical records in his file he contends demonstrate that Iredell knew its communication with him was not effective.[13] (Appellant's Brief at 41.) The first one is a record from his March 19, 2010 visit to the emergency room which states that a review of systems was "[d]iffcult due to the patient's deafness." JA 492. Any communication with an individual who is deaf and cannot speak, however, would be difficult for a person who hears and speaks and this statement in a medical record does not indicate that Iredell knew that its communication with Godbey was ineffective, only that it was more difficult than it would have been with a hearing, speaking patient.

---

[13] Godbey also claims that medical records "that document his inability to communicate also document Iredell's efforts to address these barriers as 'none.'" No such medical records are contained in the Joint Appendix, and Godbey's cites for these alleged records is only to his expert's report and testimony, not to any specific medical record.

The second record is a Daily Patient Assessment from August 23, 2010. On this record, the nurse, Tami Wooten, on a box titled "Normal Cognitive/Perceptual/Pattern," checked both the line noting "Within Normal Limits" and the line noting "Ineffective Communication." Beside the line labeled "Ineffective Communication," Wooten wrote "deaf." JA 502. Wooten explained that she checked that line to denote the Godbey is deaf and needs auxiliary aids in order to communicate, but also noted that his cognitive abilities were within normal limits. JA 344. Wooten testified that had she thought in her professional judgment that Godbey was not receiving effective communication, she would have contacted the nurse manager immediately to make sure he was offered appropriate aids and services. JA 345. These two isolated medical records, out of several hundred, are not sufficient to show that Iredell knew that its communication with Godbey was not effective but merely indicate that Godbey is deaf and requires auxiliary aids in order to communicate effectively.

Godbey further argues that Walker admitted that she believed he needed an interpreter to communicate effectively. (Appellant's Brief at p. 42.) Godbey misrepresents Walker testimony, however. When Walker first spoke with Godbey's mother, she thought Godbey was a child who could not read and write, and if that was the case, he would have required an interpreter. JA 161. After

meeting Godbey and communicating with him by writing notes, Walker believed that writing notes provided him effective communication. JA 161.

The regulations provide for a variety of auxiliary aids and make no distinction as to which among these aids are preferable in specific situations. The ultimate decision as to what measures to take rests with the provider as long as the communication that results is effective. 28 C.F.R. § 36.303(c)(1)(ii). As the Fourth Circuit stated in *Feldman v. Pro Football, Inc.*, No. 09-1021, 2011 U.S. App. LEXIS 6188 * 28 (4th Cir. March 25, 2011) (internal quotations omitted), "[t]he auxiliary aid requirement is a flexible one" and "full and equal enjoyment is not so capacious as to mean that an individual with a disability must achieve an identical result or level of achievement as persons without a disability."

At the time of his visits, Iredell had no knowledge, either from Godbey or his caregivers, that Godbey was not able to communicate effectively using the provided auxiliary aids. Therefore, as the District Court held, Iredell lacked the requisite knowledge to be liable for intentional discrimination.

### C. Iredell's official took appropriate action when informed Godbey had requested a sign language interpreter.

The Supreme Court has held that "[f]or conduct to be deliberately indifferent, there must be knowledge of likely harm and failure to act on the part of a policymaker, that is someone capable of making an 'official decision' on behalf of the organization." *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290-

91 (1998) (Title IX).[14] *But see Rosen v. Montgomery County,* 121 F.3d 154, n.3 (4th Cir. 1997) (predating *Gebser* and noting that "under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent.") The Court in *Gebser* held that for an organization to be liable for monetary damages under Title IX, there must be:

> [A]n official, who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf, has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290. The purpose of the "official" requirement is to ensure that an entity is only liable for the deliberate indifference of someone whose actions can fairly be said to represent the actions of the organization. *Id.*

In *Loeffler v. Staten Island University Hosp.,* 582 F.3d 268, 275 (2nd Cir. 2009) (internal quotations omitted), the Second Circuit noted that "intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federal protected rights will result from the implementation of [challenged] policy . . . [or] custom." The court

---

[14] The Court in *Liese v. Indian River County Hosp.,* 701 F.3d 334, 347 (11th Cir. 2012) explained that because of the similarities between Title IX and the Rehabilitation Act, "*Gebser's* purpose-and-scope reasoning applies with similar force to the [Rehabilitation Act] and yields the same result," noting that the two general purposes of Title IX—to avoid the use of Federal funds to support discriminatory practices and to protect citizens against discriminatory practices— are shared by § 504 of the Rehabilitation Act.

in *Loeffler* found that the hospital's administrator in the Patient Representative Department and the plaintiff's surgeon, who laughed off the plaintiff's son's demand for an interpreter, were arguably policymakers. *Id. See also Saltzman v. Board of Commissions of the North Broward Hospital District,* No. 0612734, 2007 U.S. App. LEXIS 14294 at **8 (11th Cir. June 15, 2007) ("For conduct to be deliberately indifferent, there must be both knowledge of likely harm and failure to act on the part of a policymaker, that is, someone capable of making an 'official decision.'"); *Freydel v. New York Hospital,* No. 00-7108, 2000 U.S. App. LEXIS 31862 at * 7 (2nd Cir. 2000) ("In order to succeed on a [Rehabilitation Act] claim for damages, plaintiff must further show that a policymaker of the program intentionally discriminated against him or her.").

The Eleventh Circuit in *Liese v. Indian River County Hosp.,* 701 F.3d 334, 348-49 (11th Cir. 2012), addressed the legal question of whether the deliberate indifference of a hospital's medical personnel can be attributed to the hospital so that the hospital can be found to have acted with deliberate indifference. The court considered two possible ways to impute liability: respondeat superior or the narrower approach adopted by the Supreme Court in *Gebser,* and ultimately adopted the *Gebser* approach, holding that for a hospital to be liable for violation of the Rehabilitation Act, an official of the hospital must have been deliberately indifferent to the rights of the plaintiff. *Id.* The court defined an official as

"someone who enjoys substantial supervisory authority within an organization's chain of commend so that, when dealing with the complainant, the official has complete discretion at 'key decision points' in the administrative process." *Id.* at 350. The court held that for the plaintiff's claim to survive summary judgment, a reasonable juror must be able to find that at least one of the hospital's doctors: (1) knew that the hospital had failed to provide the plaintiff with appropriate auxiliary aids necessary to ensure effective communication, (2) had the authority to order that aid be provided, and (3) was deliberately indifferent as to the hospital's failure to provide aid. *Id.* at 351. The court then found that the plaintiff's doctor met all three of the essential elements because the plaintiff had told him the day before surgery that her ability to read lips was limited, that the doctor laughed at her and made exaggerated facial movements, and that she had at least twice told the doctor that she needed an interpreter and both times he had ignored her request, even though he had the authority to order an interpreter. *Id.*

In this case, the only "official" at Iredell who had any notice of Godbey's requests for an interpreter arguably was Walker, the nurse manager, who according to Iredell policy, had the authority to obtain an interpreter. JA 258-262. Although other courts have found doctors to be hospital officials, Godbey has not identified any of his physicians, or claimed that any of them failed to provide him an interpreter, except for Dr. Dunaway. Dunaway, however, is a physician in private

practice, and is not an employee, agent, or official of Iredell, and the interaction Godbey uses to assert that Dunaway discriminated against him did not even take place at Iredell. JA 341. Furthermore, Godbey admitted that he never asked Dunaway for an interpreter or told Dunaway that he could not understand. JA 398, 412.

As for Walker, once informed of Godbey's request, she immediately started looking for an interpreter. When she could not locate the list of outside interpreters that was normally kept in the nursing manager's office, she subsequently contacted Shaw, an off duty nurse, having been informed that Shaw could interpret for Godbey because she had learned sign language in order to communicate with her deaf child. JA 151-152. Although in hindsight, Godbey claims that he could not communicate effectively with Shaw, Walker did not know that at the time and, based on the information she had received regarding Shaw, it was reasonable for Walker to believe that Shaw could provide effective interpretation for Godbey. Furthermore, because it was after 8:00 p.m. on Sunday night, and because there were no certified sign language interpreters located in Statesville, Walker's ability to engage an outside interpreter was limited. JA 41-42. Walker's actions cannot be deemed to be deliberately indifferent because she did everything she could to get an interpreter for Godbey that night. Even if a court were to find that Walker was negligent in calling Shaw to interpret, negligence alone is not sufficient to show

38

the deliberate indifference necessary to create liability for Iredell. *See Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005) (holding negligence, even if gross, cannot constitute deliberate indifference).

The other nurses who treated Godbey were not officials of Iredell. They had no supervisory authority and, although they could request that an interpreter be provided, they did not have the authority to actually obtain an interpreter according to Iredell policy. Thus the actions of these nurses and others who may have treated Godbey cannot be used to demonstrate that Iredell was deliberately indifferent to Godbey's right because they were not officials or policymakers and had no authority to obtain a sign language interpreter on their own.

Because no official at Iredell had knowledge that Godbey's communication with its staff was ineffective and refused to correct it, Iredell was not deliberately indifferent to Godbey's rights under § 504.

### D. Iredell has policies and procedures to ensure that hearing-impaired patients are provided effective communication.

Iredell is committed to providing effective communication to all of its patients and with that goal in mind, has policies and procedures to provide guidance to staff in communicating with deaf or hearing and/or speech impaired patients. JA 40. Iredell's policy "Communicating with Patients Who Are Hearing

Impaired, Speech Impaired, Limited English Proficient Individuals"[15] was in effect at the time of Godbey's visits. JA 47-51. The policy provides for the use of a variety of appropriate auxiliary aids and services necessary to ensure effective communication with individuals with disabilities including written and preprinted materials, telecommunication devices for the deaf (TDD's), and sign language interpreters at no charge to the patient. JA 47-51. Any medical staff member who believes that a sign language interpreter is needed to communicate effectively with a patient is directed by the policy to contact the Administrative Nursing Supervisor or the Administrator-on-Call who would attempt to contact an interpreter using a list of certified sign language interpreters kept in the Administrative Nursing Supervisor's office. JA 47-49. Hospital staff is provided training regarding this policy through classroom and/or computer-based training and each of Godbey's nurses was knowledgeable about the policy.[16] JA 41, 153, 170-173, 201, 209-211.

---

[15] This policy was replaced in July 2012 by a new policy entitled "Communication Services: Interpreter and/or Translator" which was put in place when Iredell contracted with Deaf Talk to provide video interpreting services. JA 41.

[16] Godbey misrepresents the record and takes Walker's testimony out of context when he claims that "Iredell's nursing supervisor was not aware of Iredell's policies, and testified when asked about who had the authority to request interpreters, that "It's not written, as far as I know." (Appellant's Brief at p. 8.) Walker's quoted statement was in response to a question as to whether a written policy existed that a request for an interpreter could be made by any number of people. (Walker's Dep. p. 67-68, 5:12-cv-00004, Dkt. No. 29-7 at p. 19 of 20.) Walker testified at length about Iredell's policy and the procedure for requesting an

Furthermore, all patients at Iredell are informed of their right to effective communication through the Patient's Bill of Rights, which is included in the Patient Handbook. JA 40, 45.

Courts have held that the existence of policies and procedures to provide effective communication to hearing-impaired patients, such as Iredell's policy, is relevant to the determination as to whether hospitals are deliberately indifferent regarding the needs and rights of hearing-impaired patients. For example, in *Nordwall v. PHC-Las Cruces, Inc.,* CA No.12-0429, 2013 U.S. Dist. LEXIS 116039, *161 (D. N.M. July 31, 2013), the court held that because the defendant hospital had a policy and procedure to provide appropriate auxiliary aids for deaf patients, even if it made mistakes while executing its policy, the hospital nevertheless attempted to accommodate the patient which precluded a finding that the hospital acted with deliberate indifference to the patient's rights under Section 504.

In *Saltzman v. Board of Commissions of the North Broward Hospital District,* No. 06-12734, 2007 U.S. App. LEXIS 14294 at ** 10 (11th Cir. June 15, 2007), the court held that the hospital had not been deliberately indifferent to a deaf patient, even after it failed to secure a sign language interpreter after the patient and his family made multiple daily requests. The court found significant

interpreter. (Walker's Dep. pp. 54-61, 67, 5:12-cv-00004, Dkt. No. 29-7 at pp. 16-17, 19 of 20.)

that the hospital had a policy in place for assisting hearing-impaired patients, including provision of TTY phones and a list of interpreting services to call. Hospital employees, pursuant to its policy, attempted to locate an interpreter. Although that attempt may have been negligently executed, the court held that "negligence is not intentional discrimination." *Id.*

Likewise in this case, Iredell had a policy and procedure in place to provide accommodations to hearing-impaired patients. Iredell complied with its policy and understood its obligations under § 504 regarding deaf patients. The Hospital engaged outside sign language interpreters without problems in the past. Except for Godbey, Iredell has never had a complaint that it had failed to provide effective communication to hearing impaired patients. *See Freydel v. New York Hospital,* No. 00-7108, U.S. App. LEXIS 31862 at * 14 (2d Cir. Dec. 13, 2000) (finding no deliberate indifference on failure of hospital to provide sign language interpreter after it received multiple requests, noting that the hospital had a policy to provide sign language interpreters if needed, and finding significant that there was no record that the hospital had received prior complaints about its failure to provide sign language interpreters).

### E.    Godbey failed to demonstrate that Iredell intentionally discriminated against him.

Godbey has not shown, as is his burden, that Iredell had notice that his rights were being violated and failed to take corrective action. Iredell provided him

reasonable accommodations and Godbey never notified Iredell that these accommodations were not effective for him. Had Iredell known at the time that the provided accommodations were not effective, it would have looked for other accommodations. Godbey, however, argues that because Iredell knew he was deaf, it should have provided him ASL certified interpreters without him asking. That is not the law and even Godbey admits that interpreters are not always required. (Appellant's Brief at 27.) Some deaf patients may be able to read and write effectively, or may require sign languages other than ASL. Even if Iredell may have been negligent in not realizing Godbey needed other accommodations, negligence is not sufficient to show intentional discrimination. Godbey has failed to meet his burden of showing that there are genuine issues of material facts as to whether Iredell intentionally discriminated against him.

The facts in the cases cited by Godbey finding intentional discrimination are very different than the facts here. In *Liese v. Indian River County Hospital District,* 701 F.3d 334, 339 (11th Cir. 2012), the plaintiff and her husband, both of whom were deaf, requested interpreters on multiple occasions. Critically the plaintiff communicated to her physician that she could not understand him when he asked if she could read his lips and asked her doctors at least twice to provide an interpreter, yet no other accommodations were offered. *Id.* at 339-340. In finding the hospital intentionally discriminated, the court noted that the plaintiff's

physician was a hospital official who was on notice that the plaintiff could not understand, had been requested to provide an interpreter, had the authority to provide an interpreter, and refused to do so. *Id.* at 350.

In *Loeffler v. Staten Island University Hosp.,* 582 F.3d 268 (2nd Cir. 2009), the plaintiff, who was deaf, and his family made multiple requests to the hospital to secure an interpreter, both before the plaintiff's surgery and during his stay. For example, the plaintiff made requests during pre-admission testing weeks before surgery to the operating surgeon who laughed it off, and subsequently made repeated requests ten days before surgery, four days before surgery, and the day before surgery. *Id.* at ** 20. On the morning of surgery, the plaintiff's family went to the Patient Representative Department to request an interpreter, requested an interpreter from the surgeon again, and during surgery, went to the Patient Representative Department four more times to request an interpreter. *Id.* The plaintiff's family also requested that an interpreter be present in the recovery room and that a TTY machine be provided. *Id.* After the surgery, the plaintiff's son again requested an interpreter from the surgeon. *Id.* Despite these repeated requests, no interpreter was ever present during the plaintiff's lengthy hospital stay. The court held that based on the obvious shortcomings in the hospital's policy, the hospital's conduct, as well as the alleged apathetic response of the plaintiff's physician, notwithstanding his authority to correct the discrimination, a reasonable jury could

44

conclude that the hospital was deliberately indifferent to the plaintiff's rights. *Id.* at ** 21.

In *Proctor v. Prince George's Hospital Center,* 32 F. Supp. 2d 820 (D. Md. 1998), the plaintiff, who was deaf, made repeated requests for interpreters that were ignored. Upon arrival at the hospital after a motorcycle accident, the plaintiff informed several doctors that he needed a sign language interpreter, the plaintiff's family, upon being informed that the plaintiff's foot was going to amputated, told an emergency room attendant that he needed an interpreter, while the plaintiff was in intensive care, the plaintiff's sister requested a sign language interpreter, and repeated her request the next day. *Id.* at 823. When no interpreter was ever provided, the plaintiff's sister met with the hospital's administrative office and expressed frustration about the hospital's failure to provider her brother with an interpreter. *Id.* An interpreter was eventually provided after this fourth request. *Id.* In addition, the hospital was on notice of the need to provide sign language interpreters because just three years earlier, the Office of Civil Rights of the United States Department of Health and Human Services ("OCR") found that the hospital was in violation of § 504. *Id.* at 822. In light of these repeated, unfulfilled requests and the earlier OCR finding, the court found that the hospital had intentionally discriminated against the plaintiff. *Id.* at 830.

45

The facts in this case are very different than those presented in the cases cited by Godbey. Iredell understands that federal law requires it to provide effective communication to all patients, including those who are hearing impaired, and Iredell's practice demonstrates that it has done so repeatedly. Rather than proactively requesting the hospital provide him with an ASL interpreter, as the patients did in the cases he relies upon, Godbey believes the hospital should have known, without him telling anyone, that he did not have a strong command of English and that he could only effectively communicate with the assistance of an ASL certified interpreter.

Although Godbey claims that Iredell ignored the repeated requests for interpreters that he and his family made, this is not supported by the record. On the two occasions Godbey specifically requested interpreters from Iredell (October 10, 2010 and January 17, 2011), Iredell provided individuals to interpret for him and there is nothing in the record to indicate that Iredell knew that these individuals were not effective. On his other visits, interpreters were present to sign with him, a TDD was offered, which Godbey refused, and the staff communicated with him through written notes and preprinted materials, with no notice, either from Godbey or otherwise, that these accommodations were not providing him effective communication. Godbey has the burden of showing that Iredell had notice that it

was violating his right for effective communication under § 504 and refused to correct it, and he has failed to meet this burden.

## CONCLUSION

The District Court, viewing the facts in the light most favorable to Godbey, correctly granted summary judgment to Iredell, finding that it had not been deliberately indifferent to Godbey's rights. The undisputed facts demonstrate that Iredell did not ignore Godbey's requests and took reasonable steps to provide accommodations it believed would ensure him effective communication. Iredell's staff believed their communications with him were effective, no official at Iredell ignored his requests, Iredell has policies and procedures in place to ensure effective communication, and most importantly, Godbey never provided notice that the provided accommodations were not effective.

Even though in hindsight these accommodations may have fallen short, this does not demonstrate that Iredell intentionally discriminated against Godbey. Without notice from either Godbey or its medical staff that the provided accommodations were not effective for him, Iredell was without knowledge that Godbey's rights under § 504 were being violated and without such knowledge, Iredell cannot be found to have intentionally discriminated against him.

There are no issues of material fact as to whether Iredell was deliberately indifferent to Godbey's rights and the district court correctly held that Iredell had not intentionally discriminated against Godbey in violation of § 504.

Respectfully submitted,

Nelson Mullins Riley & Scarborough LLP

s/Debbbie Whittle Durban
Debbie Whittle Durban
NC State Bar No. 39115
E-mail: Debbie.durban@nelsonmullins.com
Bank of American Corporate Center
100 North Tryon Street, 42nd  Floor
Charlotte, NC 28202
(803) 255-9465

Donald R. Pocock
N.C. State Bar No. 29393
E-mail:Donald.pocock@nelsonmullins.com
380 Knollwood, Suite 530
Winston-Salem, North Carolina 27103
Phone:  (336) 774-3324

Attorneys for Iredell Memorial Hospital

March 3, 2014

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2153      **Caption:**  Michael Godbey v. Iredell Memorial Hospital, Inc.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [✓]  this brief contains _____12,156_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]  this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [✓]  this brief has been prepared in a proportionally spaced typeface using
    Microsoft Office Word 2007_____ [*identify word processing program*] in
    14 pt. Times New Roman_____ [*identify font size and type style*]; **or**

    [ ]  this brief has been prepared in a monospaced typeface using
    _____ [*identify word processing program*] in
    _____ [*identify font size and type style*].

(s) Deborah Whittle Durban_____

Attorney for Iredell Memorial Hospital, Inc._____

Dated: March 3, 2014_____

# CERTIFICATE OF SERVICE

I certify that on <u>March 3, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Robert M. Elliot via CM/ECF to
rmelliot@epmlaw.com

<u>s/Deborah Whittle Durban</u>

Signature

<u>March 3, 2014</u>

Date